```
             IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF NEBRASKA

UNITED STATES OF AMERICA,      )
                               )
               Plaintiff,      )         4:05CR3062
                               )
          v.                   )
                               )
MARK ANDREW SIMPSON,           )         REPORT, RECOMMENDATION
                               )              AND ORDER
               Defendant.      )
                               )
```

## INTRODUCTION

The defendant, Mark Andrew Simpson, has filed a motion to suppress all evidence and statements obtained by members of the Webster County Sheriff's Department and the Nebraska State Patrol ("NSP") as a result of the search, seizure, arrest, and questioning of defendant that occurred on or about March 16, 2005. Filing 15. The defendant claims the searches of his garage, residential property, and business violated his Fourth Amendment rights. He claims his statements must be suppressed under the Fourth Amendment as fruit of these illegal searches, and under the Fifth Amendment because he was not advised of his <u>Miranda</u> rights before being subjected to custodial interrogation. I conclude that defendant's motion to suppress should be denied.

## FINDINGS OF FACT

On March 16, 2005 an anonymous caller contacted the Webster County Sheriff's Department and stated propane tanks were being moved around and people were "acting suspiciously" on Simpson's property in Guide Rock, Nebraska. Shortly thereafter, the Webster County dispatcher received a call from an NSP operator. NSP had also received an anonymous tip concerning activities in

Guide Rock, and was requesting information from the Webster County Sheriff's Department concerning Mark Simpson and Patty VanBoening.

The Webster County dispatcher relayed the anonymous tip and the NSP inquiry to Deputy Sheriff Clyde Beckman.  Sheriff Jim Disney was also advised of the developments.  Both Sheriff Disney and Deputy Beckman knew Simpson from numerous past contacts, two of which included requests for consent to search Simpson's property.  Ten to twelve years before March 2005, Sheriff Disney contacted Simpson at his apartment in Red Cloud, Nebraska and asked Simpson for consent to search the apartment.  Simpson refused to provide consent.  Two weeks before the events of March 16, 2005, Simpson spoke with Deputy Beckman.  At that time, Deputy Beckman asked if he could search Simpson's camper parked behind the Tin Roof Sundae.  Simpson said, "No, not without a warrant."

In response to the March 16, 2005 anonymous tips, Sheriff Disney and Deputy Beckman met and devised a plan to observe the Simpson residence and investigate the anonymous tips received. They intended to have Deputy Beckman wait in his patrol car about a block and a half from the Simpson residence while Sheriff Disney drove past the residence in his personal vehicle to conducted surveillance while remaining undetected.

Sheriff Disney arrived at the Simpson property during daylight hours at approximately 7:00 p.m.  As the sheriff passed the property, he saw Mark Simpson, his father-in-law, Marshall Yung, and Joe Richardson standing in the yard.  Marshall Yung, who knew the sheriff from prior contacts, saw the sheriff drive past.  Sheriff Disney knew he had been identified.  Since Simpson

2

was now alerted to law enforcement presence and surveillance, Sheriff Disney discontinued the surveillance, met with Deputy Beckman, and the officers decided to approach the residence and perform a "knock-and-talk."

Deputy Beckman drove to the front of the residence and was the first to make contact with Simpson.  As the deputy approached, Simpson and Richardson were standing by the garage talking and Simpson was locking the garage door.  When the deputy began speaking with Simpson, Richardson went into the house. Richardson and his wife were already leaving the property when Sheriff Disney reached the front yard of Simpson' home and made contact with Simpson.

Conflicting testimony was offered concerning what happened during the brief period between Deputy Beckman's initial contact with Simpson and Richardson's departure.  Richardson, Simpson, and Deputy Beckman agree that Simpson was told at the outset that Deputy Beckman needed to talk to Simpson about a complaint of suspicious activity at that location.  According to Richardson and Simpson, who are long-time friends, Deputy Beckman asked for consent to search the garage, and when Simpson did not consent, Deputy Beckman stated that even without Simpson's consent, the officers were going to search the garage by cutting off the lock, and that a warrant was on the way.  Simpson also claims Deputy Beckman threatened to arrest him if he did not consent, and that he ultimately consented to a search of the garage because he believed that if he consented, he would not be arrested immediately and in front of his children.  Deputy Beckman denies threatening to cut off the lock or stating that a warrant was en route.  Deputy Beckman testified that Richardson was not present during the deputy's discussion with Simpson on the issue of

3

consent.  According to Deputy Beckman, Richardson went into the house immediately after Deputy Beckman said he needed to talk to Simpson, and the consent issue was not raised until Sheriff Disney, who approached from the alley behind the residence, had arrived.

Having been afforded the opportunity to evaluate the witnesses, I find that the testimony of Richardson and Simpson is not credible; that is, I find that in their contacts with Simpson, no law enforcement officer, including Deputy Beckman, ever stated that a warrant was en route or that the officers would cut the garage lock and conduct the search even absent Simpson's consent.

Based on the credible testimony, I conclude the following dialogue and events occurred after contacting Simpson and until the officers entered the garage.  Sheriff Disney and Deputy Beckman asked Simpson if they could "look around" the area, and specifically in the garage, to confirm that Simpson was not engaged in manufacturing methamphetamine.  When Simpson responded that he did not cook methamphetamine, Sheriff Disney, who had suspected Simpson of illegal drug activity for some time, said "Mark, I know better than that."  When Simpson stated there was nothing in the garage, Sheriff Disney responded, "then you shouldn't care if we looked around the garage."  Simpson repeated that there was nothing in the garage and explained he did not want the officers to search because law enforcement officers "tore up all his stuff" when searching his apartment years earlier.  Sheriff Disney and Deputy Beckman both assured Simpson that they would not tear up the garage.  Simpson asked where they wanted to start searching, and Deputy Beckman answered, "the garage."  Simpson responded, "Okay," walked with the officers to

the locked garage door, took the key out of his pocket, unlocked and opened the garage door, and put the key back in his pocket. Simpson never asked to see a warrant. Simpson claims Deputy Beckman and Sheriff pushed past him through the open garage door. However, based on the officers' credible testimony, I conclude Simpson stepped through the open garage doorway first, followed by Deputy Beckman and Sheriff Disney.

The ensuing search of the garage began at approximately 7:15 p.m. Simpson remained near the front doorway of the garage. Sheriff Disney entered, turned right, and proceeded along the south wall to an east back room addition of the garage. Using his flashlight for illumination, Deputy Beckman walked straight ahead, turned right, and walked between the north wall and a long work bench positioned east/west in the middle of the one-stall garage. See Exhibit 3. When Deputy Beckman reached the northeast corner of the work bench and garage and began to turn right, he discovered a black "lawn and leaf" sized trash bag.

Though Simpson claims the black bag was half full, closed, laid over on its side, and covered with collapsed cardboard boxes, I do not find this testimony to be credible. Rather, I find the black trash bag was in Deputy Beckman's path as he walked the circumference of the garage; was positioned upright and open on top of some boxes or milk crates, with the opening at the deputy's chest level; and the black bag was full and had a smaller white semi-transparent bag at the top and readily visible to the officer. Once Deputy Beckman's attention was focused on the black bag, he noticed it contained several white semi-transparent "Wal-Mart" bags. From the reflection seen when he illuminated the contents of the white bag with his flashlight, Deputy Beckman concluded that the white bag contained many

5

"blister packs"–the individual tablet packaging with silver backing which is typically used to package pseudoephedrine and other over-the-counter medications. Some of the semi-transparent bags within the black bag were double-bagged or triple-bagged, and the bags were tied tightly.

Deputy Beckman announced to Sheriff Disney that he believed he had found something. Sheriff Disney, who had just finished looking in the east addition of the garage, moved toward Simpson. Deputy Beckman placed the large black bag near the work bench area where Sheriff Disney and Simpson were standing, lifted a small white bag out of the black bag, and placed it onto the work bench. As Deputy Beckman opened the small white bag, Simpson said (to Sheriff Disney), "Jim, am I going to jail now--tonight." Deputy Beckman found pseudoephedrine blister packs in the white bag, and in a separate triple-bagged white bag, he found "bunk"–a pasty methamphetamine cooking residue--in a coffee filter. Deputy Beckman looked at the other contents in the black bag and saw more white bags containing empty pseudoephedrine blister packs and smashed Coleman fuel cans.

Sheriff Disney decided to seek assistance from NSP's clandestine laboratory team and instructed Deputy Beckman to set the bags down. At Sheriff Disney's direction, Deputy Beckman placed the black bag beside the work bench and verbally advised Simpson of his <u>Miranda</u> rights. Simpson acknowledged that he understood his rights and stated he was willing to help the officers in any way he could.

At approximately 7:30 p.m., Sheriff Disney used his cell phone to call for NSP assistance. Deputy Beckman placed Simpson in the deputy's patrol car. Simpson was neither under arrest nor

6

handcuffed at that time. While awaiting the arrival of NSP officers, Deputy Beckman secured the garage area, and Simpson was not questioned by either Deputy Beckman or Sheriff Disney.

NSP Trooper Michael Heikkenen arrived at approximately 8:30 p.m. When the trooper arrived, Simpson was still in the patrol vehicle. However, Simpson's family was preparing to leave and Deputy Beckman allowed Simpson to exit the patrol vehicle and say goodbye to his family. After a brief search of the family and friends still at Simpson's residence, those individuals were permitted to leave. Simpson was then escorted by Deputy Beckman to the garage area where Sheriff Disney and Trooper Heikkenen were located.

Trooper Heikenen advised the sheriff that a written consent to search and waiver of Miranda rights should be obtained. Accordingly, Deputy Beckman presented a "Voluntary Permission to Search" and a "Statement of Miranda Rights" form to Simpson, who was standing near a trash dumpster by the garage. Simpson is a literate adult who was not under the influence of any controlled substance on March 16, 2005. Deputy Beckman asked Simpson to read the Miranda form, direct questions or problems he may have with the form to the deputy, and initial each Miranda right as it was read. Simpson asked no questions, initialed each right, and signed the form. See exhibit 1. The deputy then asked Simpson to complete the consent to search form. Simpson completed the form (excluding at the time the Tin Roof Sundae notation) and signed the consent to search. See exhibit 2.

At Trooper Heikkenen's direction, Deputy Beckman then began performing an inventory of the contents of the black bag. While the deputy was opening the bags, Trooper Heikkenen asked Simpson

7

if he understood his rights and if he was still giving the officers permission to search the property.  Simpson said, "Yes."  Trooper Heikkenen asked Simpson if there was anything in the garage or house that could harm someone.  Simpson pointed out the Coleman fuel and blister packs in the garage trash and then mentioned that he had a 12-gauge shotgun in the house.  Trooper Heikkenen observed the contents Deputy Beckman had retrieved from the black bag and noted blister packs and peeled lithium batteries.  See exhibit 4.

Trooper Heikkenen went into the house and, after performing a cursory search of the home to assure it was safe, met with Sheriff Disney and Simpson in the living room.  As he spoke with Trooper Heikkenen, Simpson pointed out coffee filters in the house which later tested positive for methamphetamine, and a can of acetone in the pantry.  The officers searching the premises found other evidence within the home and propane tanks with blue "nurse tank valves," which are used for anhydrous ammonia.  In response to questioning, Simpson admitted to manufacturing methamphetamine for his own use and for sale to buyers in Kansas, explained the process step-by-step, and stated he disposed of the refuse in the county or in the dumpster behind the Tin Roof Sundae, a business property owned by Simpson and located on University Street in Guide Rock.  When Trooper Heikkenen asked questions about the Tin Roof Sundae, Simpson's demeanor changed but he never refused to answer questions or revoked his Miranda waiver.

At approximately 9:30 p.m., NSP Investigator Steven Kolb spoke with Simpson.  He showed Simpson the Miranda form Simpson had already signed, confirmed that Simpson had signed the form and was advised of his rights, and asked Simpson if he still

understood those rights. Simpson said, "Yes." Investigator Kolb asked Simpson if he was still willing to give the officer a statement. Simpson said, "Yes."

NSP and Webster County Sherif's Department officers had told Investigator Kolb of past late night activities by Simpson and others at the Tin Roof Sundae. The Tin Roof Sundae was not listed on the signed written consent form signed by Simpson and provided to Deputy Beckman. Investigator Kolb asked Simpson for permission to search the Tin Roof Sundae property, and Simpson verbally agreed to this search. Investigator Kolb asked if he could add the "Tin Roof Sundae" and its address to the consent to search form previously signed by Simpson. Simpson agreed to having the "Tin Roof Sundae" added, and initialed this addition.

The Tin Roof Sundae was locked. When officers asked Simpson for the key to the building, Simpson initially stated his wife had the key. He then stated the key was on a pickup key ring that was lost on the driveway. The officers looked on the driveway and could not find the key. The officers searched in the house, found a large ring of keys in a can, and asked if the Tin Roof Sundae key could be on that ring. Simpson stated he did not believe the key was on that ring, but at the officers' request, agreed to let them try to use the keys on that ring to open the business. One of the keys opened the Tin Roof Sundae, and that building was searched at approximately 1:00 a.m. or 2:00 a.m. on March 17, 2005.

Within the Tin Roof Sundae, officers found a propane tank containing anhydrous ammonia; a blue liquid--Coleman fuel which tested positive for methamphetamine; coffee filters with methamphetamine residue; blister packs; Coleman fuel cans;

9

lithium batteries, some of which were peeled; sludge; and a hot plate.

Sheriff Disney had remained with Simpson from the time Sheriff Disney and Simpson entered Simpson's home, throughout all questioning, during the property searches, and until daylight, when Simpson was transported to Red Cloud. Simpson was calm and quiet throughout, sleeping occasionally. Simpson never asked the officers to stop their questioning, nor did he object to any of the property searches being performed. Simpson did not revoke his consent to search the property, never asked to see a search warrant or whether a warrant was en route, and never asked for a lawyer.

## LEGAL ANALYSIS

The defendant's motion to suppress raises both Fourth and Fifth Amendment challenges. The defendant claims his "Fifth Amendment rights under the United States Constitution were violated by law enforcement when he was in custody and interrogated without the benefit of his _Miranda_ rights." Filing 16, defendant's brief at 5. He claims the warrantless search of his garage violated his Fourth Amendment rights because it was conducted without a valid consent, or any recognizable exception to the warrant requirement, and even assuming consent was given, the search exceeded the scope of the consent. Filing 16, defendant's brief at 3-4. During the course of the hearing, the defendant also claimed he did not consent to the officers' search of the Tin Roof Sundae.

1.  <u>Fourth Amendment Claims</u>.

As to defendant's Fourth Amendment claims, Sheriff Disney and Deputy Beckman readily acknowledge they had no warrant to search the garage, and no basis to obtain a warrant. They claim the defendant consented to the search.

Police may lawfully acquire access to search someone's property even without a warrant if that person voluntarily consents to the search. <u>United States v. Pennington</u>, 287 F.3d 739, 746 (8th Cir. 2002); <u>United States v. Bradley</u>, 234 F.3d 363, 366 (8th Cir. 2000). The Eighth Circuit has clearly and recently summarized the analysis required in determining if the defendant voluntarily consented to a search.

> A court determines whether consent is voluntary under the totality of the circumstances. The Government bears the burden of proving voluntary consent by a preponderance of the evidence and must show that the defendant behaved in such a manner that the officer reasonably believed that the search was consensual. In evaluating the reasonableness of the officer's belief, we consider the characteristics of the person consenting, including the party's age, intelligence and education, whether he was under the influence of drugs or alcohol, whether he was informed of his right to withhold consent, and whether he was aware of rights afforded criminal suspects. We also consider the environment in which the alleged consent took place, specifically (1) the length of time he was detained; (2) whether the police threatened, physically intimidated, or punished him; (3) whether the police made promises or misrepresentations; (4) whether he was in custody or under arrest when the consent was given; (5) whether the consent occurred in a public or a secluded place; and (6) whether he stood by silently as the search occurred.

<u>United Stated v. Esquivias</u>, 416 F.3d 696 (8th Cir. 2005). See also <u>United States v. Mancias</u>, 350 F.3d 800, 805 (8th Cir. 2003).

Simpson is a literate adult who speaks English.  He was not under the influence of any drug or alcohol on March 16, 2005.  Although Sheriff Disney and Deputy Beckman did not inform Simpson of his right to withhold consent, Simpson was aware of this right.  On previous occasions, Simpson refused to consent to a search in the absence of a warrant.

Simpson had been detained very briefly, if at all, when the officers asked him if they could "look around" the property, and specifically the garage, to confirm Simpson was not engaged in manufacturing methamphetamine.  Simpson was not in a secluded area or under arrest when the officers contacted him.  The contact was made during daylight, on Simpson's own property, and with family members and friends nearby in his home.

Although the defendant claims Deputy Beckman threatened Simpson with arrest, and Simpson and Richardson both claim Deputy Beckman misrepresented that a warrant had been obtained and the officers would cut the lock and search the garage even without Simpson's consent, I do not find this testimony credible.  Simpson and Richardson were long time friends, Simpson supplied Richardson with methamphetamine, and although Simpson testified that Deputy Beckman threatened to arrest Simpson, Richardson never mentioned a threat of arrest.  Though Simpson claims he was told a warrant was en route, throughout the entire investigation which lasted long into the night, Simpson never asked to see a warrant or questioned why it had not arrived at the scene.

The officers did ask Simpson to consent more than once.  Simpson did not specifically deny the initial requests for consent, but instead responded that there was nothing to find in the garage and denied manufacturing methamphetamine.  The

officers challenged Simpson's statements of innocense by responding "Mark, I know better than that," and asking the defendant why he would deny consent if he had nothing to hide. Though such comments may have some coercive effect on a suspect, the defendant has not argued or testified that these comments prompted his consent.  Moreover, based on the defendant's testimony and the totality of the circumstances presented, I conclude these comments had little or no coercive influence on this defendant.  I find that Deputy Beckman and Sheriff Disney did not threaten, intimidate, or punish the defendant, and made no promises or misrepresentations to secure the defendant's consent.

After being assured that the officers would not tear up the garage, the defendant said "Okay" in response to the officers' request to "look around" the property, starting with the garage, and unlocked and opened the garage door.  Simpson did not object when Deputy Beckman and Sheriff Disney entered the garage, and Simpson stood by silently as they walked through the garage and inspected its contents.

Under the credible evidence presented, I conclude the government has proved by a preponderance of the evidence that a reasonable officer under the circumstances would believe Simpson's verbal consent was valid and permitted them to enter and search the defendant's garage.

The defendant contends that Deputy Beckman exceeded the scope of the consent when he retrieved, opened, and investigated the contents of white bags within black trash bag.  "The standard for measuring the scope of consent under the Fourth Amendment is that of objective reasonableness--what would the typical

13

reasonable person have understood by the exchange between the officer and the individual?" <u>United States v. Fleck</u>, 413 F.3d 883, 892 (8th Cir. 2005).

Based on the officers' statements, Simpson knew the officers wanted to look in the garage for evidence of methamphetamine manufacturing. Simpson said, "Okay," and unlocked the door. Simpson did not identify any areas or containers within the garage that could not be searched. His consent was broad and unlimited, was never withdrawn, and the officers never stated or indicated they intended to limit the scope of their search in any way. Under such circumstances, a reasonable officer under the circumstances would have concluded Simpson consented to a search of the garage and all compartments or containers therein. <u>United States v. Coffman</u>, 148 F.3d 952 (8th Cir. 1998)(where defendant invited officers to "look around" and did not limit the search to certain areas, his consent was broad and unlimited and permitted officers to search under his bed and pillow).

Moreover, though Simpson testified to the contrary, I conclude the black bag was standing open and upright at Deputy Beckman's chest level as he walked through the garage, and without removing the contents of any white bag within the black bag, Deputy Beckman saw in plain view what he reasonably believed to be evidence indicative of methamphetamine production; that is, a very large quantity of blister packs such as those used to package pseudoephedrine, a component of methamphetamine. Irrespective of the scope of Simpson's consent, Deputy Beckman was entitled to seize this evidence.

> Pursuant to the plain-view doctrine, a law enforcement officer may seize an object without a warrant if the officer did not violate the fourth amendment in

>    reaching the place from which the object could be
>    plainly viewed, "the object's incriminating character
>    is immediately apparent, and the officer has a lawful
>    right of access to the object itself."

United States v. Chipps, 410 F.3d 438, 442 (8th Cir. 2005)(quoting United States v. Collins, 321 F.3d 691, 694 (8th Cir. 2003)).

Over an hour after the officers searched the garage and arrested the defendant, Simpson signed a written consent to search his residence, including the garage.  Before signing this form, Simpson was advised of his Miranda rights.  He signed the form and granted the officers permission to search his "pickup & all other vehicles & buildings on premises."  Thereafter, his house was searched and incriminating evidence found.  Simpson pointed out incriminating evidence within his home and did not object to the officers' search.  While I conclude Simpson's verbal consent was in and of itself sufficient to permit a search of Simpson's residence, including the garage, his written consent, provided after being advised of his right to remain silent and his right to counsel, strongly reinforces that the defendant also consented to a search of his home and vehicles.

The defendant claims, however, that he did not consent to a search of the Tin Roof Sundae.  Before that property was searched, Investigator Kolb added the "Tin Roof Sundae Building on University" to the written consent form, and Simpson initialed the addition.  Simpson claims he did not believe his initials indicated a consent to the search, but only that he was aware of the modification to the original consent form.

Simpson verbally consented to a search of the Tin Roof Sundae before the reference was added to the form, and when he

15

initialed the addition, never stated his initials meant anything other than a consent to search the Tin Roof Sundae.  Irrespective of what Simpson subjectively meant by initialing the Tin Roof Sundae addition to the consent form, a reasonable officer under the circumstances would believe he consented to the search.  His later reluctance to produce the key to the building was not an "unequivocal act or statement of withdrawal" sufficient to revoke his consent.  United States v. Ross, 263 F.3d 844, 846 (8th Cir. 2001).

I therefore conclude that the searches of Simpson's garage, residential property and vehicles, and the Tin Roof Sundae were all conducted pursuant to Simpson's voluntary and valid consent.  I therefore conclude the defendant's Fourth Amendment rights were not violated, and the evidence derived from these searches should not be suppressed.

2.   Fifth Amendment Claim.

Having concluded that no Fourth Amendment violation occurred, and therefore the defendant's statement should not be suppressed as fruit of the unlawful searches, I must address Simpson's Fifth Amendment claim that he was not advised of his Miranda rights.

Based on this evidentiary record, the defendant's first inculpatory statement occurred when, as Deputy Beckman was inspecting the black bag and it contents, Simpson said, "Jim, am I going to jail now--tonight."  Since Simpson was neither in custody nor responding to any question when he made this statement, the statement is not subject to suppression.  Miranda protections are triggered only when defendant is both in custody

and being interrogated.  United States v. Boyd, 180 F.3d 967, 977 (8th Cir. 1999).

When the defendant was arrested, he was verbally advised of his Miranda rights.  However, even then, he was not questioned by any officer until he was afforded the opportunity to read a written advisement of rights, had read and initialed each right to indicate he understood, and signed the waiver.  Trooper Heikkenen was the first officer to question Simpson, and during this questioning, the defendant never revoked his consent or invoked his right to counsel.  Before Investigator Kolb began his questioning of the defendant, he reaffirmed that Simpson understood his Miranda rights and was still willing to respond to the officers' questions.  Under these facts, there is no merit to Simpson's claim that his statements must be suppressed because he was not advised of his Miranda rights.


IT THEREFORE HEREBY IS RECOMMENDED to the Honorable Richard G. Kopf, United States District Judge, pursuant to 28 U.S.C. §636(b)(1)(B), that the defendant's motion to suppress, filing 15, be denied.

The parties are notified that a failure to object to this recommendation in accordance with the local rules of practice may be held to be a waiver of any right to appeal the district judge's adoption of this recommendation.

IT FURTHER HEREBY IS ORDERED:  Trial is set for 9:00 a.m. on October 3, 2005 for a duration of three trial days before the Honorable Richard G. Kopf. Jury selection will be at the commencement of trial.

DATED this 30th day of March, 2005.

                              BY THE COURT:

                              s/ *David L. Piester*
                              David L. Piester
                              United States Magistrate Judge